[Civ. No. 27589. Fourth Dist., Div. Two. June 15, 1982.]

HARTFORD ACCIDENT AND INDEMNITY COMPANY,
Petitioner, v.
WORKERS' COMPENSATION APPEALS BOARD, Respondent;
JUDY HAYNES et al., Real Parties in Interest.

COUNSEL

Towner, Kristjanson, Bellanca & Hill and Brian A. Hill for Petitioner.

No appearance for Respondent.

Douglas Murray for Real Parties in Interest.

OPINION

KAUFMAN, J.—Petitioner, Hartford Accident and Indemnity Company (Hartford), the workers' compensation insurer of Walsh & Associates, seeks review of an opinion and decision of the Workers' Compensation Appeals Board (the Board), after reconsideration, awarding the dependent widow and seven children of Starling Timothy Haynes (the decedent) death benefits on account of his death resulting from injuries sustained in a motorcycle accident while he was returning to his temporary home after attending a class required by his union's apprenticeship program.

On review Hartford advances numerous contentions including that the evidence establishes the defense of intoxication as a matter of law; that there is no substantial evidence to support the Board's determination the decedent came within the "commercial traveler" exception to the going and coming rule; that the injury and resulting death did not arise out of and occur in the course of the employment; that the employee was engaged in horseplay at the time of the accident so that recovery is barred; that the injury and death resulted from the employee's intoxication so that recovery is barred; and that Hartford and the employer (the defendants) were denied procedural due process by the

WCAB trial judge's receiving evidence outside the presence of the parties after the case had been submitted for decision and striking the testimony of a police officer. We have concluded that the "commercial traveler" exception to the going and coming rule has no application to the case and that the defendants were deprived of their procedural rights. The decision must therefore be annulled. We do not address the other contentions except insofar as they may bear on the dispositive issues.

*Facts*

In May 1979 the decedent had come to the Los Angeles area to seek employment as a surveyor with Walsh & Associates, a West Covina civil engineering firm, by which he had previously been employed. Walsh & Associates rehired the decedent in May 1979 as a chainman.

The decedent and his wife had decided to sell their home in Santa Maria and purchase a home in the Hesperia area. Escrows had been opened on both homes at the time of the accident. At the time of the accident the decedent was staying at his father's home in Hesperia. He used a motorcycle for transportation to save gas.

Since Walsh & Associates was a union shop the decedent was required to join the union as a condition of employment. To become a member of the union it was necessary to participate in an apprenticeship program which required the satisfactory completion of certain classroom work and on the job training. Apparently Walsh & Associates did not actively encourage its employees to attend the required classes; it did not provide reimbursement for transportation and other related expenses. However, it was required by its union contract to make contributions to finance the cost of tuition for the classes required in the apprenticeship program.

By a letter dated August 22, 1979, the administrator of the apprenticeship committee informed the decedent that he was assigned to attend a class in surveying practices at Riverside City College. On August 29, 1979, at approximately 6 p.m., the decedent arrived at Riverside City College to register for class. There he met his cousin, Jeb Westley Haynes, who was registering for a different class required as a condition of his employment.

At approximately 8 p.m., after having completed registration, Haynes and his cousin decided to go to the Branding Iron in San Bernardino for a couple of drinks. They drove to the bar in Jeb Haynes' truck, leaving Haynes' motorcycle in the parking lot at city college. At the Branding Iron, the two men each consumed two or three drinks of scotch. At around 9 p.m. they left the bar and returned to the college to pick up Haynes' motorcycle.

Following a 10-15 minute conversation in the college parking lot, the two men departed, Jeb for Orange County and the decedent for his father's home in Hesperia. Both of them stopped for the same traffic signal at Magnolia and 14th Streets in Riverside. As they left the signal when the light turned green, the decedent's motorcycle accelerated rapidly and the front wheel came off the pavement either once or twice. The motorcycle struck a traffic island; the decedent lost control of the motorcycle; it crashed and the decedent was thrown to the ground and injured. He died of these injuries September 14, 1979.

Riverside Police Officer Joseph Cahill testified that he was a percipient witness to the accident and the investigating officer. He testified he was sitting in a police vehicle parked in the parking lot of a title company on Main Street north of 14th Street and that he was facing westbound. He was not sure of the name of the title company but he thought it was Safeco. At about 10:49 p.m. he saw a motorcycle and pickup truck pull up eastbound at a red light on 14th Street after having come from Magnolia Avenue. While stopped at the red light the drivers of both vehicles were "revving their engines at high r.p.m." When the light turned green for eastbound 14th Street both vehicles took off from the intersection at a high rate of speed. The front tire of the motorcycle came off the ground about a foot. The officer gave chase with the intention of citing the drivers of both vehicles for engaging in a speed contest. As he was traveling up 13th Street he heard the motorcycle's engine go to a very high r.p.m. from which he estimated the motorcycle's speed at 50 to 60 miles per hour. Just before he reached Orange Street the officer heard a loud explosion. He thought the motorcycle engine had blown up, but when he got to the scene he found the motorcycle had crashed and its driver was lying on the pavement of 14th Street. The officer testified that he had an unobstructed view of the motorcycle and pickup truck as they were stopped at the intersection but that he had since visited the scene and observed that a four-foot high block wall had been built which would now block the

view of the intersection. Citations were issued to Jeb Haynes for engaging in a speed contest and to the decedent for drunk driving.

The decedent was taken to Riverside Community Hospital for the treatment of his injuries. A laboratory technologist at the hospital testified that at approximately 11:45 p.m. on the date of the accident, a blood sample was drawn from decedent to complete a blood profile and to test for blood alcohol level. The test revealed a blood alcohol level of .12. It was stipulated that the defendants could prove that fact.

Detective Kenneth Fouse of the Riverside Police Department testified that after inspecting decedent's motorcycle and the scene of the accident and discovering no defects in either the vehicle or the roadway, he concluded that the prima facie cause of the accident was driving while intoxicated with a blood alcohol level of .12.

A criminalist with the Orange County Sheriff's Department testified that, in his opinion, an individual with a blood alcohol level of .12 is sufficiently mentally and physically impaired so as not to be able to safely operate a motor vehicle. The criminalist was not permitted to state his opinion of the alcohol level in the decedent's blood stream at the time of the accident based on the reading later taken at the hospital together with known rates of alcohol dissipation in average persons.

Called to testify, Jeb Haynes related the events of the evening including the drinking by each man of two or three drinks at the Branding Iron, that the decedent's motorcycle accelerated quickly when the traffic signal turned green and that he observed the front wheel of the decedent's motorcycle leave the pavement. He testified, however, that he and the decedent were not engaged in any kind of speed contest at the time of the accident. He testified that although he was given a traffic citation for engaging in a speed contest, the citation was later dismissed. He further testified that after the police and ambulance arrived at the scene, he was taken to the police department for a blood alcohol test and released about an hour later. He was not charged with or cited for drunk driving.

At the conclusion of the hearing both sides rested and the matter was submitted for decision. Nevertheless, without notice to the parties or counsel and outside their presence, the WCAB trial judge (WCJ) viewed the scene and several months after the hearing sent a letter dated December 18, 1980, addressed to Officer Cahill at 4102 Orange Street

in Riverside, requesting that the officer write to him, "identifying the name of the title company adjoining the parking lot where you were parked. You testified you thought it was Safeco but in visiting the scene it appeared that you might have been in the lot of the title company next to or down the street from Safeco." The letter concluded: "I am using this letter in the hope that we could avoid a further hearing."

A copy of the letter was sent contemporaneously to counsel, and a copy was later sent to the Riverside Chief of Police. Nevertheless, the judge received no answer to the letter. The WCJ then, or perhaps before writing the letter, telephoned "the title company [which of the two possible title companies was called is not specified] and learned the wall had been up for two years."

On February 13, 1981, the WCJ issued a notice of intention to strike Officer Cahill's testimony that read: "Unless good cause is shown in fifteen (15) days, the testimony of Riverside Police Officer Cahill, given September 18, 1980, will be stricken because of his refusal to identify the name of the Title Company in whose parking lot he testified he was located when he observed applicant's decedent."

Counsel for Hartford responded by letter dated February 18, 1981, that read in pertinent part: "Defendant Hartford ... does not believe that any proper grounds exist to strike Officer Cahill's testimony, as the officer is a disinterested witness, and he testified that he had an unobstructed view of the intersection at the time in question. [¶] In the event that the Board is not satisfied with the present record, it is respectfully suggested that this matter be set for hearing for taking additional testimony of Officer Cahill. This office would be pleased to make arrangements for the witness' presence. Thank you for your courtesy."

The WCJ replied to counsel in a letter dated February 25, 1981, as follows: "All I want Officer Cahill to do is to identify the Title Company in whose parking lot he was parked when he witnessed the accident. [¶] No further hearing will be scheduled."

On May 13, 1981, the WCJ issued a findings and award and order granting commutation in favor of the decedent's wife and children, finding in pertinent part: "8. It is found that the decedent's stipulated blood alcohol level was not sufficient to be the proximate cause of his fatal injuries and therefore, no serious and willful misconduct. [¶] 9.

The testimony of Riverside Police Officer Cahill who purported to be an eye witness to the accident is stricken because of his refusal to answer a simple interrogatory as to his exact location when the accident occurred. The 'horse play' defense must fail. [¶] 10. Applicant was covered by the 'commercial traveler' rule."

In his opinion on decision the WCJ stated in pertinent part: "While .12 is regarded by the State of California as constituting a sufficient level to be driving 'under the influence' it is not considered that the decedent must necessarily be intoxicated at that level. Also the alleged intoxication must be the proximate cause of the injury. There is another possible cause of the accident. The traffic island his motorcycle struck could have been difficult to see at night.

". . . Officer Cahill apparently did not witness the incident because he declined to answer an interrogatory. The parking lot he was purportedly in had a high wall around it for sometime prior to the accident."

Hartford petitioned for reconsideration on substantially the same grounds raised on review. Initially the WCJ filed a report recommending that reconsideration be denied because Hartford's petition was not timely filed. However, the Board found otherwise, granted reconsideration and directed the WCJ to submit a supplementary report addressing the substance of Hartford's petition.

In his supplementary report and recommendation the WCJ stated in pertinent part: "1. The decedent had two high balls at the Branding Iron in San Bernardino. If an 80-year old lady weighing 90 pounds can become intoxicated on two drinks at the Branding Iron, this Judge will buy a round for the house. It is a Country Western dance hall that is not known as a heavy pourer.

"The parties stipulated to a blood alcohol level of .12 because applicant's attorney did not want to prolong the hearing with the testimony of witnesses to prove a level that for years and years wouldn't even be brought to trial in an automobile driving case. [¶] The intoxication must be the proximate cause of the industrial injury. The cousin who supposedly put on an 'exhibition of speed' with the decedent had the same number of drinks. He was not cited or even tested for intoxication.

"

"3. Officer Cahill's testimony was stricken because he testified as an eyewitness. He said he was parked in a title company parking lot. He was asked by the Court whether or not there was a wall around the lot. He said there was later but not on the date of the accident. This Judge called the title company and learned the wall had been up for two years. An interrogatory was sent to the witness to ask him where exactly he was parked. No answer. A copy to the Chief of Police later. No answer. A copy hand-delivered by Ed Jenkins, Riverside Risk Management Director. No answer. A copy to defense counsel who called the witness. No answer. And the Judge erred in striking the testimony?

".    .    .    .    .    .    .    .    .    .    .    .    .    .

"5. The applicant's counsel proved the commercial traveler exception to the going and coming rule. Applicant lived away from home, was in the act of registering for courses necessary to permit him to join the union which was a prerequisite to keeping his job. He was AOE-COE 24 hours a day."

On December 1, 1981, the Board issued its opinion and decision after reconsideration stating in pertinent part: "The Board agrees with the trial judge that the commercial travel [*sic*] exception was established and that evidence of horseplay on the part of decedent was not sufficiently established to overrule the trial judge's determination to the contrary. Even if police officer Cahill's testimony was not stricken, the trial judge was justified in relying upon the testimony of Jeb Westley Haynes who testified that there was no pre-plan speed contest when the accident occurred. Moreover, the Board does not agree that defendant was denied due process of law by the trial judge's action of stricking [*sic*] the testimony of officer Cahill. A notice of intent to strike officer Cahill's testimony was issued by the trial judge on February 13, 1981. Sufficient time was allowed to defendant to either secure a statement from said witness or to schedule a deposition to secure the information the trial judge desired."

### Discussion

The order must be annulled on either of two bases. █ First, there is no substantial evidence to support the determination that the decedent fell within the "commercial traveler" exception to the going and coming rule. █ Second, the defendants' procedural due proc-

ess rights were violated in respect to evidence highly significant to the case.

*"Commercial Traveler" Exception*

This case simply does not involve the "commercial traveler" exception to the going and coming rule. If any exception to the going and coming rule is applicable, it is the "special mission" or "special errand" exception. (See *Dimmig* v. *Workmen's Comp. Appeals Bd.* (1972) 6 Cal.3d 860, 867-868 [101 Cal.Rptr. 105, 495 P.2d 433], and cases there cited.[1]) Distinguishing between the "special errand" or "special mission" exception and the "commercial traveler" exception Herlick states: "The commercial traveler rule is similar to the special errand rule but connotes a wider range of activity, such as, the travel of salesmen, executive, professional and technical personnel, and others who may be called upon to represent or perform work for an employer at some distance from headquarters." (1 Herlick, Cal. Workers' Compensation Law Handbook (2d ed. 1978) § 10.18, p. 358; see also, e.g., *Wiseman* v. *Industrial Acc. Com.* (1956) 46 Cal.2d 570, 572 [297 P.2d 649]; *California C. I. Exch.* v. *Indus. Acc. Com.* (1936) 5 Cal.2d 185, 186 [53 P.2d 758].) Larson makes a distinction between the two exceptions and indicates that the "commercial traveler" exception is applicable only in those cases in which the employee's traveling was a part of the employee's work, that is, a part of the service to be performed by the employee for the employer. (See 1 Larson, Workmen's Compensation Law (1978) § 16.00; 1A Larson, Workmen's Compensation Law (1979) § 25.00; see also *IBM Corp.* v. *Workers' Comp. Appeals Bd.* (1978) 77 Cal.App.3d 279, 282.)

In its opinion and decision after reconsideration the Board gave no reason for and referred to no evidence in support of its determination that the "commercial traveler" exception was applicable; it simply stated it agreed with the WCJ's determination. Albeit belatedly, the WCJ did give some indication of the basis for his determination that the

---

[1]Inter alia, the court stated: "*Smith* [*Smith* v. *Workmen's Comp. App. Bd.* (1968) 69 Cal.2d 814, 820 [73 Cal.Rptr. 253, 447 P.2d 365]] recognizes, however, a further exception to the ['going and coming'] rule, namely, the so-called 'special errand' or 'special mission' doctrine which applies to cases where the employee is injured while going to or returning from an activity outside of his normal daily work routine. In such cases, according to *Smith*, the going and coming rule 'succumbs ... because the employee there "engage[s] upon a mission which incidentally or indirectly contribute[s] to the service and benefit of the employer."'" (6 Cal.3d at p. 867; italics deleted.)

"commercial traveler" exception applied when he stated in his supplemental report and recommendation on Hartford's petition for reconsideration: "Applicant lived away from home, was in the act of registering for courses necessary to permit him to join the union which was a prerequisite to keeping his job. He was AOE-COE 24 hours a day."

The facts mentioned are insufficient basis for application of the "commercial traveler" exception, and the conclusion that the decedent was "AOE-COE 24 hours a day" is wholly unwarranted on the facts of this case. The decedent was living temporarily in his father's home and therefore "lived away from home" only in a sense. The decedent's home in Santa Maria was being sold, and his home was his father's house in Hesperia even if on only a temporary basis. Even more fundamentally, the decedent's living "away from home" was not required by the employer nor the employment; it was a matter purely personal to the decedent. The only travel required by the employment was the decedent's traveling to Riverside City College to attend class and his return to Hesperia. Although occasioned by the employment, that traveling was not part of the decedent's work, not a part of the service to be rendered by him to the employer and did not make him a "commercial traveler."

Whether the "special errand" or "special mission" exception to the going and coming rule or some other exception might be applicable we do not decide, because the Board did not purport to base its decision on any exception to the going and coming rule other than the "commercial traveler" exception. ■ A decision of the Board either denying or granting a petition for reconsideration or amending the original findings or award after reconsideration must "state the evidence relied upon and specify in detail the reasons for the decision." (Lab. Code, § 5908.5.) And if the evidence relied upon and the reasons stated for the decision do not support it, the decision must be annulled. (*Goytia* v. *Workmen's Comp. App. Bd.* (1970) 1 Cal.3d 889, 893 [83 Cal.Rptr. 591, 464 P.2d 47]; *Granado* v. *Workmen's Comp. App. Bd.* (1968) 69 Cal.2d 399, 406-407 [71 Cal.Rptr. 678, 445 P.2d 294]; *Evans* v. *Workmen's Comp. App. Bd.* (1968) 68 Cal.2d 753, 755 [68 Cal.Rptr. 825, 441 P.2d 633].)

*Procedural Due Process*

■ The cavalier attitude of the WCJ toward the procedural due process rights of the defendants is shocking. The statement in his report and recommendation upon Hartford's petition for reconsideration that

he would "buy a round for the house" if an "80-year-old lady" could become intoxicated on two drinks at the Branding Iron would be amusing if it did not reflect either ignorance of or disregard for the rights of litigants to have their disputes adjudicated on the basis of evidence presented in their presence after notice and subject to the right of cross-examination.

The WCJ's attitude found full flower, of course, when after the case had been submitted for decision, without notice and without the presence of the parties he not only viewed the scene of the accident but communicated with an unidentified title company and accepted as highly material evidence in the case some out-of-court report to him by an unidentified person that a wall had existed around that title company's parking lot for more than two years, all without the right of the defendants to cross-examine the declarant with respect to his or her knowledge and the accuracy of the information imparted and indeed, to inquire into the matter of whether the WCJ had the correct parking lot or not.

It is perhaps even more appalling that the Board would countenance such procedure. Its statement in its opinion and decision after reconsideration that defendants' due process rights were not abridged because the WCJ gave 15 days' notice of his intention to strike the testimony of Officer Cahill is no answer at all. In the first place, the notice of intention to strike the testimony of Officer Cahill in no way cured the WCJ's receipt of evidence on his own motion without notice or opportunity to be heard. Secondly, promptly upon receiving the notice of intention to strike the testimony of Officer Cahill, the defendants requested that the matter be reopened for further hearing, and their request was denied.

As to the striking of Officer Cahill's testimony we observe that if the WCJ was dissatisfied with the state of the evidence he should have reopened the matter for the presentation of further evidence. His letter inquiry was improper because any answer received would have constituted more evidence received in the absence of the parties in derogation of their right of cross-examination. Further, the conclusion of the WCJ that the officer must not have witnessed the incident because he failed to answer the letter was wholly speculative. The record is devoid of any showing that Officer Cahill ever actually received the letter.

■ Notice and opportunity to be heard are fundamental procedural rights to which every litigant is entitled in workers' compensation pro-

ceedings as in all other proceedings of an adjudicatory nature. (See *Robert G. Beloud, Inc. v. Workers' Comp. Appeals Bd.* (1975) 50 Cal.App.3d 729, 734 [123 Cal.Rptr. 750].)

## Disposition

We do not believe the evidence establishes as a matter of law that the decedent's death resulted from intoxication; however, we do not decide the question because in further proceedings it is likely that additional evidence concerning the decedent's alleged intoxication will be presented. We, of course, do not intimate or express any opinion as to what the result should be in further proceedings, but the present order and decision of the Board must be and it is hereby annulled.

Morris, P. J., and Gardner, J.,* concurred.

---

*Retired Presiding Justice of the Court of Appeal sitting under assignment by the Chairperson of the Judicial Council.